UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff-Appellee,<br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant-Appellant. | Case Nos. 25-5095; 25-6056; 25-6507<br><br>D.C. No. 3:20-cr-00249-RS-1<br><br>Northern District of California,<br>San Francisco<br><br>**DEFENDANT'S MOTION REQUESTING THE REMOVAL OF APPOINTED CJA COUNSEL & REQUEST FOR A 90-DAY EXTENSION OF THE BRIEFING SCHEDULE TO GET OFF OF CJA** |

## <u>EXHIBIT -A</u>

## GOVERNMENT NOTIFICATION OF ANDRADE REQUEST TO RELEASE JOINT-STOCK

## RE: Request for Clarifications and Investigations

| | |
|---|---|
| From | John Pierce <jpierce@johnpiercelaw.com> |
| To | Highsmith, Christiaan ██████████████████████████████ |
| | Beausey, Karen ██████████████████████████ |
| CC | Chan, Merry (USACAN) ◄████████████ lloyd.farnham@████████ Andrew.Dawson@████████ |
| | Martha.Boersch@████████ |
| Date | Friday, November 14th, 2025 at 4:10 PM |

Hello Christiaan,

I haven't heard back from you regarding my previous message—particularly about Mr. Andrade's missing mobile data. As your agents know, Abramoff used software capable of altering WhatsApp messages and operated using his own name along with his alias "Steve Stephens" on the same WhatsApp account which any tech person can tell you that this isn't possible and therefore like there is something wrong here. Abramoff stated at trial that it was someone else and not him using his phone when also talking about Abramoff raising money for the placement of the Super Bowl Ad when the Court ordered former Counsel to stop and didn't allow Counsel to admit evidence regarding this. (Trial Tr. 1835:2 to 1837:4). Because of this, we really need to recover the missing WhatsApp messages that the RCFL imaged . Those communications show Abramoff (or whomever else that was using his phone) telling Andrade the Super Bowl ad was rejected while denying involvement in its actual release of it and the negative letter directed at the NFL and NBC.

Also, I noticed in your sentencing memorandum for Abramoff (Dkt. 62), his income from Andrade is listed as $225,000, but district records show Abramoff and Richard Naimer's DIT Network received over $700,000, plus a kickback of the $300,000 paid to Frames Per Second by Andrade at Abramoff's direction. He also was responsible for over a million dollars in relation to the  Pre-ICO and Post-ICO funds sent to the Salmond escrow account. The record further shows that he used what appears to be illegal proceeds from Eye 2 Eye Strategies, a proxy company, to pay prior restitution and that Abramoff had planned to pay for the Super Bowl ad placement utilizing illegal proceeds from Russia and Angola with the help of a Alex Praisac, Carlos Dela Guardia, and a Russian General.

Another thing omitted from the government's memorandum is Abramoff's involvement of two sons in his money laundering activity who both wrote letters of support for Jack. Two 2017 recordings—1D14 and 1D15 (attached in the link below)—confirm the government was aware of this conduct involving his son, Alex Abramoff but unfortunately excludes this from their sentencing memorandum. The government even failed to point out in their sentencing memorandum that others that were involved in international money laundering alongside Jack and his sons included but isn't limited to Richard Naimer and Neil Sunkin who both also wrote letters of support for Abramoff. Evidence already within the district record and the 9th circuit record confirm their involvement in Abramoff's international money laundering network.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

I understand the government's interest in keeping Abramoff cooperative, given the potential liability he poses to the FBI, DOJ, and CIA. However, it is essential to remain fully transparent with the Court regarding his criminal history, particularly given the clear parallels between the SunCruz Casinos theft and the theft of Mr. Andrade's digital identity technology.

Additionally, the limited production of data from Abramoff's device appears to suggest his involvement in the 2018 attack on Mr. Andrade, which occurred shortly after the government discovered materials related to Andrade in Maria Butina's residence. This conduct is consistent with statements made by a government informant in 2020 (FBI-00135998) describing Abramoff's activities.

"(U) CHS knows that Jack Abramoff (Abramoff) and his "crew" identified and threatened

people in the marijuana industry. They made threats of violence if their targets didn't do

what they demanded. CHS came to believe Abramoff was a violent person. CHS once

sold some Bitcoin to Abramoff for writing a piece for him. [See previous reporting on

Abramoff.]"

Unfortunately, the government has continued to conceal Abramoff's unlawful conduct while simultaneously labeling Mr. Andrade a *"conspiracy theorist"* and making statements that the record now shows were misrepresentations. This pattern dates back to December 5, 2022, when the government attached letters Mr. Andrade had sent to the U.S. Senate requesting an investigation into the *Russian Collusion Hoax*. Unfortunately for Andrade, Jack stated that it was Jared Kushner purchasing his coins in order to conceal the fact that it was really his son in law Jared Dunkin. (See Andrade Case, Dkts. 124, 124-2, and 124-3).

Given that Abramoff has continued manipulating the government and exploiting their own activities, it is likely that many government employees are  hoping that Judge Seeborg imposes a substantial prison sentence both as punishment for his ongoing criminal conduct and to prevent further damage to the careers of previously honest agents.

Separately, I am requesting your support in allowing Mr. Andrade to sell a portion of his joint stock in the patent assets (filed in 2015 and 2016) to fund his legal expenses and provide minimal support for his family. Given the strong likelihood that the forfeiture and restitution orders will be overturned on appeal, this request is both reasonable and necessary. We are willing to fully disclose the amount of any proceeds (if any actually materialize) and to deposit an agreed-upon percentage (15–20%) into an escrow account to be applied toward restitution and forfeiture obligations pending the outcome of a successful appeal or a §2255 motion.

Please confirm your position by Monday, November 17, 2025 (afternoon), as I plan to raise this issue with the Ninth Circuit that evening due to the ongoing financial strain.

Thank you for your time and consideration.

John

Chris and Karen,

I hope you're doing well. I have a few matters I'd like to discuss:

1. Redactions in Reply to Andrade's Bond Motion: Would you be willing to stipulate to allowing me to make some PII redactions in our Reply to Andrade's motion to remain on bond?

2. Unreported Materials: Could you please double-check if there are any additional reports or materials the prosecutors were not made aware of before we requested them? For example, the prosecutors were unaware of the Aml Bitcoin materials found in Butina's residence by SSA Quinn and SSA Wynar, as SSA Quinn didn't prepare the 302 until nearly four years later, after Andrade had already requested those materials. Specifically, I'm looking for Boyer's and his company's communications and reports regarding them with the FBI/CIA in Washington, D.C. This information is included in the USB Data I previously sent, and I've reattached it here for your convenience. It was not part of the government's discovery. If you are inclined to proceed with this, let me know.

3. Trial Ex. 805 and Missing Data: Could you investigate why Trial Exhibit 805, taken from Andrade's device, wasn't included in the Cellebrite report or the image provided to him? I'm concerned about missing data from the device that hasn't been produced. Additionally, is it standard practice for the SVRCFL to provide the FBI all data (including the unminimized image of Andrade's device) in January 2021 without retaining a copy? Since their master copy was deleted (FBI-Main-0003517), is retrieval still possible? I understand that your position may be that the government has already provided the data, but whatever pieces the government may have provided wasn't part of the actual Cellebrite report nor the image. You know where I'm going with this. I would advise against tasking the agents with this directly. If you are inclined to proceed with this, let me know.

4. Potential Civil Action: Lastly, I'm considering pursuing civil action against Attorney Neil Sunkin and his firm, as well as Attorney Shailendra Maheshwari and the Pillsbury Law Firm regarding their conduct while representing Mr. Andrade. Does the government have any objections to this?

Thank you for your attention to these matters. I look forward to hearing your thoughts.

Best regards,
John




This message, including attachments, is confidential and may contain information protected by the attorney-client privilege or work product doctrine. If you are not the addressee, any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this email in error, please destroy it and notify me immediately.

**From:** John Pierce
**Sent:** Thursday, November 6, 2025 10:41 AM
**To:** Highsmith, Christiaan (USACAN) ██████████████████████ Beausey, Karen (USACAN) ████████████████████
**Cc:** Chan, Merry (USACAN) ◄██████████████████
**Subject:** Request for Clarifications and Investigations

**19.04 MB**   4 files attached   1 embedded image

| image001.png 16.00 KB | 11.14.2015 Supporting Evidence.zip 16.74 MB | 2018 Washington DC Attack.png 801.99 KB |

| FBI-00135998 UCE Re Abramoff Violent-compressed.pdf 155.28 KB | Naimer Money Laundering Report.pdf 1.35 MB |

# Fw: Request for Clarifications and Investigations

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

**From:** John Pierce
**Sent:** Friday, November 14, 2025 7:22:34 PM
**To:** Highsmith, Christiaan (USACAN) ◄████████████████████Beausey, Karen (USACAN)
███████████████████████
**Cc:** Chan, Merry (USACAN) ◄████████████████lloyd.farnham@████████████████████
Andrew.Dawson@█████████████████████████Martha.Boersch@███████████████████
**Subject:** RE: Request for Clarifications and Investigations

Hello Christian. I forgot to add a few documents. Please use this updated link:

https://www.dropbox.com/scl/fo/cz3qtvzt4mqos01u4mwu3/ACYzzwORwvaI67tSnqsPNu8?rlkey=w6uvakvycItcIg957Irw2hbIt&st=pfh2z9np&dl=0

Thanks,

John

**From:** John Pierce
**Sent:** Friday, November 14, 2025 5:11 PM
**To:** 'Highsmith, Christiaan (USACAN)' ◄████████████████████ 'Beausey, Karen (USACAN)'
◄███████████████████
**Cc:** 'Chan, Merry (USACAN)' ◄████████████████lloyd.farnham@████████████████
'Andrew.Dawson@███████████████████████ 'Martha.Boersch@███████████████████
**Subject:** RE: Request for Clarifications and Investigations

Hello Christiaan,

I haven't heard back from you regarding my previous message—particularly about Mr. Andrade's missing mobile data. As your agents know, Abramoff used software capable of altering WhatsApp messages and operated using his own name along with his alias "Steve Stephens" on the same WhatsApp account which any tech person can tell you that this isn't possible and therefore like there is something wrong here. Abramoff stated at trial that it was someone else and not him using his phone when also talking about Abramoff raising money for the placement of the Super Bowl Ad when the Court ordered former Counsel to stop and didn't allow Counsel to admit evidence regarding this. (Trial Tr. 1835:2 to 1837:4). Because of this, we really need to recover the missing WhatsApp messages that the RCFL imaged . Those communications show Abramoff (or whomever else that was using his phone) telling Andrade the Super Bowl ad was rejected while denying involvement in its actual release of it and the negative letter directed at the NFL and NBC.

Also, I noticed in your sentencing memorandum for Abramoff (Dkt. 62), his income from Andrade is listed as $225,000, but district records show Abramoff and Richard Naimer's DIT Network received over $700,000, plus a kickback of the $300,000 paid to Frames Per Second by Andrade at Abramoff's direction. He also was responsible for over a million dollars in relation to the  Pre-ICO and Post-ICO funds sent to the Salmond escrow account. The record further shows that he used what appears to be illegal proceeds from Eye 2 Eye Strategies, a proxy company, to pay prior restitution and that Abramoff had planned to pay for the Super Bowl ad placement utilizing illegal proceeds from Russia and Angola with the help of a Alex Praisac, Carlos Dela Guardia, and a Russian General.

Another thing omitted from the government's memorandum is Abramoff's involvement of two sons in his money laundering activity who both wrote letters of support for Jack. Two 2017 recordings—1D14 and 1D15 (attached in the link below)—confirm the government was aware of this conduct involving his son, Alex Abramoff but unfortunately excludes this from their sentencing memorandum. The government even failed to point out in their sentencing memorandum that others that were involved in international money laundering alongside Jack and his sons included but isn't limited to Richard Naimer and Neil Sunkin who both also wrote letters of support for Abramoff. Evidence already within the district record and the 9th circuit record confirm their involvement in Abramoff's international money laundering network.

https://www.dropbox.com/scl/fi/u0b81m07643x1vuo0ftbg/Nov.-14.2025-Audio-Files_Etc-Zip.zip?rlkey=n3iwoc12hpm3vzcs40ebmolzq&st=n3b8bajq&dl=0

I understand the government's interest in keeping Abramoff cooperative, given the potential liability he poses to the FBI, DOJ, and CIA. However, it is essential to remain fully transparent with the Court regarding his criminal history, particularly given the clear parallels between the SunCruz Casinos theft and the theft of Mr. Andrade's digital identity technology.

Additionally, the limited production of data from Abramoff's device appears to suggest his involvement in the 2018 attack on Mr. Andrade, which occurred shortly after the government discovered materials related to Andrade in Maria Butina's residence. This conduct is consistent with statements made by a government informant in 2020 (FBI-00135998) describing Abramoff's activities.

"(U) CHS knows that Jack Abramoff (Abramoff) and his "crew" identified and threatened

people in the marijuana industry. They made threats of violence if their targets didn't do

what they demanded. CHS came to believe Abramoff was a violent person. CHS once

sold some Bitcoin to Abramoff for writing a piece for him. [See previous reporting on Abramoff.]"

Unfortunately, the government has continued to conceal Abramoff's unlawful conduct while simultaneously labeling Mr. Andrade a *"conspiracy theorist"* and making statements that the record now shows were misrepresentations. This pattern dates back to December 5, 2022, when the government attached letters Mr. Andrade had sent to the U.S. Senate requesting an investigation into the *Russian Collusion Hoax*. Unfortunately for Andrade, Jack stated that it was Jared Kushner purchasing his coins in order to conceal the fact that it was really his son in law Jared Dunkin. (See Andrade Case, Dkts. 124, 124-2, and 124-3).

Given that Abramoff has continued manipulating the government and exploiting their own activities, it is likely that many government employees are hoping that Judge Seeborg imposes a substantial prison sentence both as punishment for his ongoing criminal conduct and to prevent further damage to the careers of previously honest agents.

Separately, I am requesting your support in allowing Mr. Andrade to sell a portion of his joint stock in the patent assets (filed in 2015 and 2016) to fund his legal expenses and provide minimal support for his family. Given the strong likelihood that the forfeiture and restitution orders will be overturned on appeal, this request is both reasonable and necessary. We are willing to fully disclose the amount of any proceeds (if any actually materialize) and to deposit an agreed-upon percentage (15–20%) into an escrow account to be applied toward restitution and forfeiture obligations pending the outcome of a successful appeal or a §2255 motion.

Please confirm your position by Monday, November 17, 2025 (afternoon), as I plan to raise this issue with the Ninth Circuit that evening due to the ongoing financial strain.

Thank you for your time and consideration.


John

---

**From:** John Pierce
**Sent:** Thursday, November 6, 2025 10:41 AM
**To:** Highsmith, Christiaan (USACAN) ◄━━━━━━━━━━  Beausey, Karen (USACAN) ◄━━━━━━━━━━
**Cc:** Chan, Merry (USACAN) ━━━━━━━━━━
**Subject:** Request for Clarifications and Investigations


Chris and Karen,

I hope you're doing well. I have a few matters I'd like to discuss:

1. Redactions in Reply to Andrade's Bond Motion: Would you be willing to stipulate to allowing me to make some PII redactions in our Reply to Andrade's motion to remain on bond?
2. Unreported Materials: Could you please double-check if there are any additional reports or materials the prosecutors were not made aware of before we requested them? For example, the prosecutors were unaware

of the AmI Bitcoin materials found in Butina's residence by SSA Quinn and SSA Wynar, as SSA Quinn didn't prepare the 302 until nearly four years later, after Andrade had already requested those materials. Specifically, I'm looking for Boyer's and his company's communications and reports regarding them with the FBI/CIA in Washington, D.C. This information is included in the USB Data I previously sent, and I've reattached it here for your convenience. It was not part of the government's discovery. If you are inclined to proceed with this, let me know.

3. Trial Ex. 805 and Missing Data: Could you investigate why Trial Exhibit 805, taken from Andrade's device, wasn't included in the Cellebrite report or the image provided to him? I'm concerned about missing data from the device that hasn't been produced. Additionally, is it standard practice for the SVRCFL to provide the FBI all data (including the unminimized image of Andrade's device) in January 2021 without retaining a copy? Since their master copy was deleted (FBI-Main-0003517), is retrieval still possible? I understand that your position may be that the government has already provided the data, but whatever pieces the government may have provided wasn't part of the actual Cellebrite report nor the image. You know where I'm going with this. I would advise against tasking the agents with this directly. If you are inclined to proceed with this, let me know.

4. Potential Civil Action: Lastly, I'm considering pursuing civil action against Attorney Neil Sunkin and his firm, as well as Attorney Shailendra Maheshwari and the Pillsbury Law Firm regarding their conduct while representing Mr. Andrade. Does the government have any objections to this?

Thank you for your attention to these matters. I look forward to hearing your thoughts.

Best regards,
John

 

This message, including attachments, is confidential and may contain information protected by the attorney-client privilege or work product doctrine. If you are not the addressee, any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this email in error, please destroy it and notify me immediately.

**16.00 KB**    1 embedded image

image001.png  16.00 KB

## Import Form

| | |
|---|---|
| **External System ID:** | Delta |
| **Document Title:** | ▮ S-00099701-B-010.pdf |
| **Imported Form Type:** | FD-1023 |
| **File:** | ▮ S-00099701-B-010.pdf ███████████████████████ |
| | ▮███████ |
| **Synopsis:** | ▮ Israeli, Egyptian, UAE foreign influence via extortion media attacks; Bitcoin utilized by organized crime and foreign governments to move money |

## Filing and Security

| | |
|---|---|
| **Primary Case:** | ████████  ⊛ |
| **Serial Number:** | 80 |
| **Serialized:** | 04/13/2021 |
| **Category:** | Assessment |
| **Initiated:** | 09/08/2020 |

**Set to Expire:** 12/07/2020

Source ID: S-00099701
Date: 04/12/2021
Case Agent Name: ██████████
Field Office/Division: Los Angeles



Substantive Case File Number

Substantive Case File Number

Substantive Case File Number

(U) CHS wanted to solve the problem cannabis growers had with not being able to use the banking industry. CHS previously believed the block chain and crowd funding could solve the marijuana industry's "gray market" problem. After investing in that business for a few years, CHS became aware that a lot of marijuana growers had strange foreign connections and said suspicious things. CHS believes cartels are using the industry to clean their money. CHS went to various marijuana conventions and came to believe there are two main types of people - "dopes" and people with involvement with criminal activity. CHS has since come to believe these financial instruments can be used for nefarious purposes, and it is now being used by Russian, Chinese and Israeli operatives to wield influence in the U.S.

(U) Adam Palmer (Adam) and "Rabbi" Max Leiberman (Rabbi) were the two marijuana growers in Santa Barbara, CA, to whom CHS sold Bitcoin. Specifically, Adam invested $500,000 (USD) in a Bitcoin mine now run by Eric Yingling (Yingling), based in Washington State. A few years ago, CHS also lent about $250,000 (USD) worth of Bitcoin to movie producers who owned a marijuana business - Kia Jam (Jam) and Courtney Solomon (Solomon). Solomon has since partially paid back CHS. Solomon is associated with the major casino owner, Steve Wynn (Wynn). Palmer Lucky (Lucky), the Orange County based billionaire, also invested also in the same marijuana business. Yingling continues to run this Bitcoin investment. Neither Lucky nor CHS

(U) CHS knows that Jack Abramoff (Abramoff) and his "crew" identified and threatened people in the marijuana industry. They made threats of violence if their targets didn't do what they demanded. CHS came to believe Abramoff was a violent person. CHS once sold some Bitcoin to Abramoff for writing a piece for him. [See previous reporting on Abramoff.]

███████████████████████████████████████████

SIGNATURE

Submitted By
First Level Approved By

FD-1023 Page 5 of 5 FEDERAL BUREAU OF INVESTIGATION

████████████████████

FD-1023 FEDERAL BUREAU OF INVESTIGATION
CHS REPORTING DOCUMENT

████████████████████████████████

████████████████████████
2021-04-13T12:34:44-0700
LAOC-SW-5248702.FBINET.FBI
Submitting

███████████████████
2021-04-13T13:10:34-0700
LAOC-SW-5247905.FBINET.FBI
Approving

## 1A/1C Packages ⌄

Package 1A30

**Summary:** ████████████████████████████████████████

**Acquired By:**

**Acquired On:**
**Receipt Given:**

**Attachments:**

## Indexing ⌄

| Display Name | Enterprise Role | Entity Role | Entity Type | US Person |
|---|---|---|---|---|
| S-00099701 | CHS | Reference | PERSON | Unknown |

███████████████████████████████████████

First Previous 1 Next Last

1 - 1 of 1 Entities

**SOURCE 1**

**Type:** A collaborative source



**Drafted By:**
**Approved By:**



# Extraction Report
Apple iPhone Logical

## Participants

Richard ██████████████████████████
Jack Abramoff  1 ████████████████████████

## Conversation - Instant Messages (9)



☆  ████████████ Jack Abramoff                    12/28/2017 3:28:06 PM(UTC+0)
are you free for a call on the Angola currency deal?

☆  ████████████████ Richard                       12/28/2017 3:52:34 PM(UTC+0)
Yup.
Call is not going through for some reason. Can try your end?

☆  ████████████████ Jack Abramoff                  12/28/2017 3:55:47 PM(UTC+0)
Africa Funds Deal 12.28.2017.docx
Attachments:

https://mmg-
fna.whatsapp.net/d/f/AjaTfoEyDi__ck0guLzd-
C3w73sflTfmwWtFb9Iqa8ge.enc
be5068b0-1749-4371-85b2-a578a725dacc.docx

☆  ████████████████ Jack Abramoff                  12/29/2017 12:01:38 PM(UTC+0)
Any response to your questions from the Malaysian?

☆  ████████████████ Richard                        12/29/2017 12:06:56 PM(UTC+0)
Nothing yet.

☆  ████████████████ Jack Abramoff                  12/29/2017 2:34:08 PM(UTC+0)
Jack Maple just texted that Leong is going to be responding tonight or tomorrow.

☆  ████████████████ Jack Abramoff                  12/31/2017 9:29:23 PM(UTC+0)
Just heard from Carlos. Eduardo just called and told him that the other partners signed off on the NDA, so Carlos will be pushing them starting Tuesday on the MOU.

1



Jack Abramoff                                                                                                        1/9/2018 12:21:09 AM(UTC+0)

**Angolan Deal Notes – 1/8/2018**

-The Sultan of Johor Bahru would be approving the transaction as a business investment for the receiving banks records.
-The Sultan of Johor Bahru owns or is part owner in the developments that the 10% would be purchasing the real estate
-The money would be deposited into the banks in the UAE that the Sultan of Johor Bahru already has accounts in so that there is no "overseas remittance" guidelines.  The banks that he is working with also have branches in London, England and Amsterdam, Netherlands that can accept the funds and transfer to the Sultan of Johor Bahru's accounts in those countries. Therefore, no "overseas remittance".
-They need to make a case to the bank that this is all for "investment purposes" which the Sultan of Johor Bahru would sign off on.
oThe paperwork would say that we would be "eventually" investing up to $150Million USD in Johor Bahru, but we would only have to invest $50Million USD.
-There is another option through Jakarta Indonesia, but it is more complex and would also be for a smaller amount of money. This could be the next option.
-All the banks understand that the funds will be coming arriving in Angolan Kwanza Cash Notes.

At this time, Mr. Weng Kee Leong has confirmed with all 4 banks that they are ready to move to the next step which would be ascertaining the exchange rate, but to move forward they will need some sort of Memo of Understanding (MOU) so that Mr. Weng Kee Leong can start to finalize the negotiations.  So that we are all on the same page … Mr. Weng Kee Leong would like to have this all completed no later than February 1, 2018 and feels that it could be completed by that time.




Richard                                                                                                              1/19/2018 10:46:26 AM(UTC+0)

I spoke to Ted after speaking with Marcus late last night.
Bottom line:
Marcus is on board with the move
90 days Ted will function as a consultant will take all operational controls, subordinate to Marcus
Marcus will agree on a compensation package for the initial 90 days.
Thereafter, Marcus will determine if to give Ted ceo or other position, if at all. By then he will turn NAC into a Corp so they can phase equity into a potential package.



# HEADS OF TERMS (HOT)

**Date:**          November 19th, 2018

**Re:**          **5k minimum contract –** Tranche Size Min: 500BTC – 10,000BTC

This **Heads Of Terms** ("HOT") constitutes as an expression of interest in selling Bitcoin ("BTC") in an amount and frequency described below from **Seller** (each a "Party" and collectively the "Parties"), on the following general terms and conditions. HOT will also serve as the basis for the intent of the transactions in this HOT, all future BTC transactions, or other transactions, between the Parties and the structure of the formal Purchase Agreement ("PA"). The PA shall describe the complete terms and conditions of all ongoing and future Seller-Purchaser relationships. The HOT should not be considered as an offer or commitment to sell or purchase BTC, as the purchase is subject to the execution of a mutually satisfactory PA. The performance by the Buyer and Seller and their obligations will be set forth therein, and the satisfaction of the conditions also set forth therein. In addition, the HOT does not contain all the essential terms that the parties expect will be part of a definitive and binding PA. The proposed terms and conditions are as follows:

**PROCEDURE:**

1. Buyer lodges funds at Dubai Islamic Bank in a sub account of Victor Koenig AG controlled by the paymaster Tilgent Capital Trust (TCT)
2. Seller ends BTC to paymaster wallet (one of three trading wallets)
3. Paymaster sends BTC to buyer
4. Buyer confirms receipt of BTC to paymaster and accepts
5. Funds are released to the seller by paymaster

**TRADING PREFERENCE**:

The paymaster (TCT) is willing to extend a corporate guarantee on settlement

Buyer can buy a small tranche to connect banking or take delivery of 1 BTC when funds are settled, run analysis and either reject or accept the remaining tranche

Full DD is available on request. We have conducted extensive DD on the BTC, Paymaster and seller mandate.

**TIMELINE:**

This is an OTC market. First come first serve, the best bids will be prioritized.

**PURCHASE AGREEMENT**:
Arbitrating 3rd party will reveal that both counterparties are fully onboarded with chosen platform/method and have passed all necessary KYC/AML checks. The funds, both fiat and BTC, are also ready to transact.

Upon confirmation that both counterparties have proven legitimacy and are ready to transact, the Seller shall deliver a Purchase Agreement setting forth the specific terms of this transaction in accordance with this Letter of Intent.

Both parties require a formal Purchase Agreement to be executed in form and content satisfactory to each party and its counsel in their sole discretion. If a Purchase Agreement is not executed and delivered by both parties in five (5) business days after execution of the Heads of Terms, it shall automatically become null and void and of no further force and effect.

**CONFIDENTIALITY:**

Neither party shall disclose the contents of any negotiations or information received from the other party regarding the transaction contemplated, without the prior verbal or written consent of the other party.

**GOVERNING LAW:**

The provisions of this Letter of Intent shall be construed in accordance with the laws of England and Wales applicable to agreements made and to be performed solely within such State and without application or reference to principles of conflicts of interest.

**COUNTERPARTS:**

Any documentation may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute as one and the same.

The above sets forth an expression of the basic terms under which the seller is prepared to proceed. If the terms and procedures are agreeable, please contact myself or a member of my team.

Angolan Deal

These are the items that they are requesting so that we can put together a Memo of Understanding (MOU) between all parties (these are in no particular order):

- The person that is putting together the working relationships is Mr. Weng Kee Leong. He has been in the financial and insurance industry in South East Asia for over 50 years.
    - He will need to be paid 2% of the deal.
- Mr. Weng Kee Leong would like to choose an attorney in an agreed upon location to manage the distributions of funds based on the jurisdiction chosen.
- The structure that they would like to use is a Malaysian simple business structure.
    - Please note that Mr. Weng Kee Leong would be a director of this company. Mr. Emery Faria Dos Santos would be as well. There can be any other group of Directors appointed by Mr. Dos Santos.
- He has recommended that the jurisdiction be Malaysia or United Kingdom
- The banks that Mr. Weng Kee Leong is speaking to and all are interested are the Top 4 Chinese Banks, all that have offices in Dubai.
- They would like to have a timeline included with the MOU.
- The individual banks will determine the exchange rate based on the Kwanza/US Dollar conversion plus any standard bank fees for exchange.
- 30% of the funds would need to be invested in Malaysia
    - He recommends purchasing apartments in Johor Bahru Malaysia – This is directly across from Singapore and many workers and Singaporeans are moving there because the cost of living is 50% - 60% less. All flats would be approximately $300,000USD plus to cost to furnish. All would be completed and ready for immediate occupancy.
    - Properties will be purchased from Fortune 500 companies with all Due Diligence completed on valuation.
    - The purchase of these apartments would be done through the Dubai entity of the developer, this way funds will be in the Dubai bank and transferred to another Dubai bank.
    - Apartments can be sold after 12 months
- Upon signing of the MOU, the bank will need Know Your Client (KYC) on all parties that are being paid out of escrow. This will include copies of Passport and Utility Bill for residence.

They understand that our side will be completing the following:
- Completing all KYC on all parties
- Ensure that all parties are legal
- Transport of funds from Angola to United Arab Emirates
- Provide payment notices to each party involved – Bank will wire funds to all parties per agreement

# Fwd: Port fo San fransicso meeting

From: '██████████████████████████████

To:   ████████████████████████████████

Date: Tuesday, February 2nd, 2021 at 8:33 PM

---------- Forwarded message ---------
From: **Richard** <richard@█████████████
Date: Fri, Apr 27, 2018 at 5:35 PM
Subject: Port fo San fransicso meeting
To: Jack Abramoff <jack@████████████ Marcus Andrade (████@aclbitcoin.com) ████@aclbitcoin████

Summary

On Friday, April 27th, a meeting was held between NAC Foundation and the Port of San Francisco, a meeting which took place at the Port of San Francisco.

At the meeting were present:

On behalf of the Port of San Francisco:

Leslie Katz, Commissioner,

Executive Director, Elaine Forbes

Chief Operating Officer, Byron A. Rhett

Head of Security, _____

On behalf of NAC Foundation:

Marcus Andrade, CEO

Richard Naimer, CEO of DTN

Japheth Dillerman, Consultant

The meeting was scheduled further to discussions held between NAC and the Commissioner regarding the potential of integrating block chain applications in the operations of the Port of San Francisco.

At the meeting, NAC presented the benefits of block chain in general and in particular, the block chain applications developed by NAC. The primary focus of the discussions circled around the characteristics and benefits of the NAC backed CrossVerify Anti money Laundering Gateway which enable the verification of compliance by users customers and the advantages of the AML Bitcoin as the only currently known AML compliant digital currency.

Further discussed were possible use cases and practical implementation of these NAC blockchain application by

and in the Port of San Francisco.

The outcome of the meeting were three primary use cases which the Port of San Francisco would be most applicable, both for the Port of San Francisco and for similar West Coast ports:

Possible implementation of a blockchain based identification and tracking system for passengers and cargo which may be adopted by California Association of Ports (CAPA);

Transferring of the Transportation Worker Identification Credential (TWIC) to the NAC CrossVerify platform;

Adoption of the CrossVerify platform by Carnival and other major cruise ship operators which can be integrateable with immigration and security authorities;

Executive Director Elaine Forbes will be following up on all three of these use cases and make the required introductions for NAC to discuss the implementation of the NAC applications for theses use cases.

Richard


--

Marcus Andrade

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to legal@amlbitcoin.com. Thank you.

**From:**                Jack Abramoff <S05/Exchange Administrative Group
                              (FYDIBOHF23SPDLT)/Recipients/a1d827a503224ee9a2d075e31fc15d84-
                              jack>
**Sent:**                11/15/2015 1:05:12 PM -0800
**To:**                  'Richard' <richard@ ▅▅▅▅▅▅▅▅▅>
**Subject:**          FW: retainer
**Attachments:**    Eye To Eye Retainer Draft..docx; Ukraine Renewed and Reunited
                              Memo.docx

---

**From:** Jack Abramoff
**Sent:** Thursday, November 12, 2015 10:43 PM
**To:** Denis Gorbunenko (dgorbunenko ▅▅▅▅▅▅▅ <dgorbunenko ▅▅▅▅▅▅▅
**Subject:** retainer

Hi Denis.

I have drafted a retainer agreement that includes the items we discussed this week, divided into phases and parts.  The phase that's related to building the new force is still encapsulated in the memo I did before we met.  Therefore, I suggest that we attach that memo as an Exhibit to the retainer agreement.

The agreement will be with whatever company you guys use (please get me that info, including name of signatory, name of company and address of company - as soon as possible), and the lobbying company I will use on this side, Eye-to-Eye Strategies.  It is headed by one of my top guys, and we use it for intense and rather urgent efforts.  Jason Hickox, who has worked with me for almost 20 years, heads that particular company and they will serve as the general contractor for me to engage the others I need for this, etc.

I have not yet shared with Jason the retainer agreement, so we might still need a few changes from our side, but in the interest in moving this along quickly, I figured I should get this to you to review for this weekend, sending me any changes you require, so we can sign this on Monday and get moving.  We have a lot to do quickly.

I also do not have the banking info for this project yet, but will have it Monday, or maybe even tomorrow.  Once I have it, we'll incorporate in the retainer agreement.

Please review the document, and re-review the exhibit which is the memo I sent previously, to let me know any changes.  We'll do the same and, hopefully Monday we can have something we can all sign to move forward.

Thanks so much.

Regards,

Jack

---

# Ukraine Renewed and Reunited

Ukraine should be the bridge between Europe and the United States on the one hand, and Russia on the other hand. Instead, Ukraine has become the flashpoint for the growing conflict between the East and West. The dangerous maneuvering for hegemony between warring factions has crippled the Ukrainian economy and put the lives and futures of millions of people at risk.

The current political leadership of Ukraine is not only incapable of reversing the downward spiral that they have created, but if the nation is forced to continue to endure the weak and feckless policies promulgated by this regime, its future will be bleak indeed.

The United States is playing a very dangerous game in Ukraine, not only supporting the incumbent regime, but even pushing them to extreme measures that continue to divide the nation and exacerbate the problems. Furthermore, as part of their conflicted and ill-conceived approach, American government leaders have done all they can to marginalize and prosecute one of the only leaders capable of solving Ukraine's current crises, DF.

Unless a new powerful political force is introduced into the equation, it is likely that the American-generated, European-implemented agenda will prevent reasonable solutions to the crisis, neuter Ukraine and further widen the gulf between the West and the East.

We propose creating a broad based lobbying and public relations effort in the United States that will drive American policy involving Ukraine, constrain wayward US Government initiatives targeting DF and provide a basis for a powerful bilateral relationship between Ukraine and the US presently and into the next American Administration.

The specific goals of the effort will include the following:

- Eliminate US government efforts to politically and criminally target and prosecute DF and his allies
- Organize American power centers and political coalition allies to support the DF approach to Ukraine

1

- Organize and direct the US Congressional Caucus for Ukraine to support the DF approach
- Diminish US government support for the current Ukrainian regime
- Diminish US government efforts to support destabilizing EU initiatives on Ukraine
- Build a strong US grass roots and social media power base for DF approach to Ukraine
- Initiate Congressional action to support the DF approach to Ukraine
- Build earned and paid media footprint for DF in US
- Initiate media projects, including a feature documentary, to shape US policy and support for the DF approach to Ukraine
- Build American political leaders' awareness of and support for the Agency plan for Ukraine

Upon completion of the project, if we are successful, not only will US-Ukrainian ties likely be altered dramatically and positively, but the controlling force for these ties will be that which we have built within the United States, aligned with DF.  With a potential army of millions of supporters, the political leaders of the United States will likely take their cues from this force and not from tendentious State Department bureaucrats, much in the same way that supporters of Israel have been able to guide positively American policy toward that nation.

It is important to note that other forces vying for power in Ukraine have also arrived in the United States and are attempting to bend American policy on Ukraine toward their aims.  The most visible petitioner to date has opted for the traditional approach of hiring a team of lobbyists to impact Congressional and Administration policy.  This approach is very effective and hard to beat – unless one has decided to build a political army from within America, combined with a Washington presence.  That is what we propose.

The combination of an active American citizen base with powerful and effective Washington lobbyists almost always trumps efforts solely based on lobbyists.  The key, however, is to move quickly to deploy both the inside Washington and the grass roots approach, in conjunction and with full measure.

On the lobbying side, our team will include the most effective lobbyists, with track records of victory in a wide range of issues.  Furthermore, the

2

lobbying team will be adept at using the powerful grassroots army that the effort will build to enhance the lobbying prowess in Washington. The lobbying team will include a variety of firms, each hired for their specific expertise, and all kept under constant pressure to deliver immediate and impactful results.

To support the Washington-based lobbying efforts, we will build support for DF and his approach to Ukraine from within the United States. This support will empower DF's Washington-based supporters and give added strength and flexibility to their political and lobbying endeavors. The tactics and approaches of building this force will include, but not be limited to the following:

➢ **Organizing the Ukrainian diaspora in America** – There are one million American citizens who identify themselves as having Ukrainian heritage, however this number does not represent the many millions more who have Ukrainian ancestors. These citizens are often members of Ukrainian American organizations, but many million more who have Ukrainian heritage in their backgrounds are completely unaffiliated. Whether as members of the organized Ukrainian groups or not, few are called upon to support or even recognize important initiatives in Ukraine. We will reach out to these citizens, in order to solicit their participation in the project.

➢ **Organizing the Russian diaspora in America** – There are at least three times as many Americans of Russian background, as there are Ukrainian Americans. These citizens, like their Ukrainian counterparts, are candidates for participation in the project, as they will should comfort in the DF approach to healing the Ukraine-Russia rift, while pushing back on American interventionism through the EU. This community includes a large number of Jewish Americans, as well, who should resonate to DF's approach to Eastern European stability and peace.

➢ **Organizing the Christian Orthodox community** – The Orthodox community, including Russian, Ukrainian, Latvian and Greek communities, has a strong interest in stability and peace prevailing in the region, and are often organized through their churches and civic groups. The project will work to reach them through their leaders and through social media, to bolster the

3

growing army of support needed to alter American policy in the region.

➢ **Organizing the Catholic community** – The American Catholic community is large and powerful, and includes many who would find comfort in the DF approach to the region. The tens of millions of Catholics in America can yield a strong contingent of grass roots support for the project, once they are identified through social media, traditional media, direct mail and through their organizations and communities.

➢ **Building forces in the Evangelical Christian community** – As the Christian world experiences a worldwide attack by radical Islam, international solidarity among Christians continues to increase. We shall endeavor to tap into that movement to glean as many Evangelical supporters as possible, since this Christian movement is the most powerful and dynamic in America – and since they are likely to support strongly the DF approach to Ukraine. Activating them will increase the coalition army we are building.

➢ **Organizing College and Youth movement support** – Young Americans are increasingly having impact on our policies and they are particularly easy to organize through campus and youth organizations. As part of our efforts to build a youth force in support of DF, we propose bringing a number of youth activists from Ukraine to the United States to tour the campuses and build a support organization within America's university system. Attendant to this effort will be our efforts to identify and organize as many professors as possible to support the DF program for Ukraine – giving us more intellectual and academic gravitas to rebuff American opponents empowered by other forces from Ukraine.

➢ **Women, Veterans, Seniors** – These groups and others will yield a number of activists and organizations that we will include in the coalition of support for the DF approach to Ukraine. To access these political sectors, our researchers will glean common issue constituencies and develop materials to ignite their participation.

➢ **Building Social media power** – Our project will include a dynamic and aggressive American social media component. Using

4

proven prospecting techniques developed by the most effective social and political organizations in America, our effort will endeavor to build a powerful mailing list and social media effort. It should be noted that, once built, if large enough, this project component could also be the source of future and possibly self-sustaining funding through internet advertising and list rentals. Our prospecting will also identify a myriad of supporters geared to activism, enabling our lobbying efforts to potentially produce American popular support for the positions we advocate.

➤ **Producing and Distributing Viral Documentaries** – In order to command the politics, we have to command the message and the history. There is no more effective way to do this than by creating a first class, feature documentary film outlining history in accordance with the our goals and approach. Such a film has the potential to alter dramatically the policy agenda of the United States vis a vis Ukraine.

A film of this order would have a top Hollywood director and narrator of great import, such as a Morgan Freeman. Once completed, the film should be entered in as many international film festivals as possible, released in the box office, and then made available for free over the internet, creating a viral sensation that, itself, will generate massive coverage and support – both in the United States and abroad, including Ukraine.

In addition, we would glean from the feature sufficient footage to create an infomercial that could be run on American television, both to prospect for support and to create a self-funding mechanism.

➤ **Lobbying and Activating Congress** – While the President and Executive Branch of the federal government has certain powers over America's foreign policy, that sway is not complete.

The Congress, through control of funding and treaties, has significant impact on our foreign policy, and it is in the Congress that we should build our power base, at least initially.

With a strong and increasingly stridently pro-DF Congressional base, we will have more impact on the Executive Branch than were we to

5

primarily focus our advocacy on the Administration.  For example, our efforts to calm the raging assault on DF by the State Department is far more effective when our advocates are the Congressmen controlling the budget of the State Department.

Additionally, the ability of Congress to gain media attention in support of our initiatives gives us tremendous leverage in dealing with the Administration.

Our activities with Congress will be to educate each of the significant leaders of both parties; to bolster and activate the Congressional Caucus in support of Ukraine, and direct its activities toward support of DF initiatives; to draft and promote Congressional Resolutions advocating DF policy positions, giving them a Congressional imprimatur; to promote Congressional travel to Ukraine of our allies to help promote DF and his initiatives in Ukraine; and to draft and seek publication in the Congressional Record of a steady stream of policy and political positions supporting DF.

➢ **Creating Rapid Response Team** – The effort we propose will certainly attract opposition, from the incumbent Ukrainian government, the pernicious foes of DF in the State Department and Ukrainian competitors who aim to influence the United States to promote their own personal agendas.  It is essential that the project will include a Rapid Response Team, ready to counter any and all hostile attacks.

As noted above, the project includes many component parts, some of which are quite diverse.  Each of the endeavors described above, as well as those not listed, will require personnel adept at engineering success in these arenas.  There are also expenses associated with each project.  As with most political projects, the speed and success of the effort is directly related to the time and resources available.

Excluding the cost of producing and distributing the documentary and infomercial spin-offs, the budget for our effort would be $200,000 per month.  Similar efforts in the United States frequently can cost 3-4 times that amount, and while any additional resources for the effort will further ensure its success, we believe we can field a competitive campaign for this

6

reduced amount, given budget considerations.

The documentary and infomercial spin-offs, produced properly with top industry talent ensuring the film's credibility, will likely require a separate budget between $7.5 – 10 million.  If there is interest to proceed with that component, we can provide a more detailed plan and budget.

It is anticipated that positive project results will start to flow within the first quarter, and that each subsequent quarter will see an expansion of the political power of the project; however, the solid and impregnable foundation of the political movement created by this project will likely only take full form after the first year.

Nevertheless, almost from the outset, the political power accumulation will be sufficient to engage the threats outlined above, depending on the threat level.

In conclusion, US-Ukrainian policy is current the hostage of an elite cabal that has focused its efforts, in part, on thwarting DF.  We propose a highly aggressive reordering of the political status quo in the United States with regard to Ukraine, so that future American policy is set with deference to the powerful force we will create utilizing grassroots American activism, and effective and focused Washington-based lobbying.  With that powerful combination, our project will provide the best opportunity to eliminate the assaults on DF, and build a future US-Ukraine relationship that will be guided by his wisdom and goals.



# Extraction Report
Apple iPhone Logical

## Participants

Richard  9 ████████████████
Jack Abramoff ████████████████████

## Conversation - Instant Messages (4)

   Richard                                                    10/24/2017 5:08:00 PM(UTC+0)

A few updates from my side:
Avihood has been offered a position in NCS - the no' 1 mobile eavesdropping technology. If you ever come to need such stuff, you now have the access. Sales are to govts only, notwithstanding the fiasco with Mexico..  the full half if the glass is that he carved out an agreement that he can do our stuff.

The deeper I get into the product together with z few professionals here, it looks like we are pretty far from a product. We may be surprised but 6 months they say looks very aggressive. We may need to change the constipation though- instead of going to India and getting almost surely a partial exposure, my guys are suggesting getting everyone on the system in one room for 2 days- the Dr from China, the cto from Nevada cross verify guys and the Indians. My guys say that from there they can take over. Otherwise, each will blame the other and we'll never get a full picture.

We will need an expense budget to get a team on board to do the project. Btw, they say that doing it here will be far more expensive but will take half the time.

I am looking on the web re the if I and there is little out there, itself not a good sign, and what is there is not encouraging. Bottom line, I think we need to start thinking about what if/day after scenario, considering that we are both heavily invested in this by now.

   Richard                                                    10/24/2017 6:58:50 PM(UTC+0)

https://bitcointalk.org/index.php?topic=2056317.260

   Richard                                                    10/24/2017 7:00:01 PM(UTC+0)

Start from the last page and work back to get a picture of where it is at.

   Richard                                                    12/20/2017 7:35:35 PM(UTC+0)

Just had a call with Marcus.

Bottom line, he is all excited about it. Especially the PR prospects.
Initially, he thought it was another morgan type deal where the law firm would use coins or something. After I explained it was a reverse merger concept he I think got it. I am not completely sure as he mentioned paying them with coins, but I explained it means dilution and he appreciated the upside of it.
Even mentioned on his own initiative stepping down if there is a good bod.

We agreed the next step is to put forward a ppt.

Maybe make sure he fully understand it. But he is all hyped up about it at this point.
We will need a CEO to come in asap. He can remain president but we need a CEO. Fast. Especially no that he is receptive of it. Do you have anyone in mind?



**DLA Piper LLP (US)**
1000 Louisiana Street
Suite 2800
Houston, Texas 77002-5005
www.dlapiper.com

Christina P. Maccio



March 8, 2019


Mr. David Siegel
Chairman
2030 Limited
9th floor
9 Appold Street
London, EC2A 2AP
UK

Dear Mr. Siegel:

This law firm represents Marcus Andrade and his wholly-owned companies, NAC Foundation, LLC ("NAC") and Black Gold Coin, Inc. ("BGC").

We understand that a company named ID Works Limited ("ID Works") was formed on March 4, 2019 by Jack Samuel Thornborough, the head of Compliance and Legal for 2030 Asset Management Limited ("2030"), and that 2030 is the majority shareholder of ID Works. We understand that the CEO of ID Works is Nigel Quantick.  As you know from 2030's previous negotiations with Digital Identity Trust Network ("DITN"), Mr. Quantick is the former CEO of DITN.  Prior to working at DITN, Mr. Quantick was the COO of CrossVerify, Ltd. (now known as CheckPal, Ltd.), a company in which Fintech Fund, FLP ("Fintech Fund") holds a controlling interest.  Mr. Andrade is the general partner of Fintech Fund.

As we believe you are aware from 2030's negotiations with DITN, DITN owed a rather large debt to NAC. DITN's debt to NAC was not due to NAC's pre-payment for services in the future from DITN, but rather due to NAC's funding of all of DITN's operations. Mr. Andrade was the majority owner of DITN.  When 2030 declined the deal with DITN, Richard Naimer abruptly closed DITN, according to communications from him on February 14, 2019.

It is critical to note that DITN entirely utilized source code obtained from NAC for DITN's development work of the digital identity platform.  We believe that Mr. Naimer or Mr. Quantick may have provided source code from DITN to members who now are associated with ID Works or 2030.

Please be advised of the following:

1.      NAC is the rightful owner of any source code provided to ID Works, 2030, or their affiliates from DITN and any associated copyrights and trade secrets.



David Seigel
March 8, 2019
Page Two

2.    BGC is the owner of numerous patents that were practiced in the source coded provided to ID Works, 2030, or their affiliates from DITN.

3.    Neither DITN nor any former officers of DITN were authorized to transfer any source code to ID Works or to provide any ownership or license rights in any copyrights, trade secrets, or patents relevant to that source code.

In light of the formation of ID Works and Mr. Quantick's employment with ID Works, we wanted to apprise you of the above facts. To the extent that ID Words, 2030, or their affiliates are in possession of this source code, we demand that 2030 and ID Works immediately return to NAC all digital copies (including all storage media containing such digital copies) and hard copies of the source code.

In the alternative, if 2030 is interested in discussing a licensing agreement to utilize the source code and BGC's patented technology, Mr. Andrade, BGC, and NAC would be open to discussing terms with 2030.

Please respond to this letter by the close of business on March 11, 2019. If you are represented by counsel, please forward this to him or her and ask them to contact me.

Kind regards,

*Christina P. Maccio*

Christina P. Maccio

cc:    Christopher Skulte
       Tomer Sofinzon
       Jack Thornborough
       ████████████
       ████████████

       2030 Holdings



**DLA Piper LLP (US)**
1000 Louisiana Street
Suite 2800
Houston, Texas 77002-5005
www.dlapiper.com

Christina E. Ponig



March 4, 2019

*Via E-mail: Richard*

Richard Naimer
DIT Network Ltd.
23 Austin Friars
London EC2N 2QP, UK

Mr. Naimer:

As you know, DLA Piper LLP represents Marcus Andrade and his wholly-owned companies, NAC Foundation, LLC ("NAC") and Black Gold Coin, Inc. ("BGC"). I am writing in response to your e-mail dated February 14, 2019, 12:17 a.m. CST to Christopher Donovan, an associate at our firm.

You suggest in your e-mail that you might put DIT Network, Ltd. ("DIT") into receivership or some other insolvency proceeding in the United Kingdom. Your e-mail raises a number of issues.

First, your failure to provide the equipment and electronic information that Mr. Donovan requested from you on February 13, 2019 is concerning, as is your failure to return the external hard drive notwithstanding repeated requests.

Second, as you have acknowledged in correspondence with DLA Piper, NAC is a substantial creditor (and perhaps the only substantial creditor) of DIT. If you put DIT into receivership or any other insolvency proceeding, please keep us apprised of those developments.

Third, DIT has no ownership interest in the source code that DIT has in its possession. It similarly has no right to sell or utilize that code. That source code is derivative of prior work performed at Mr. Andrade's direction, and the continued development of that software was funded by NAC. Moreover, as you have readily acknowledged in your communications with Mr. Andrade, neither DIT nor any other third party can use or commercialize the source code without a valid license to use BGC's patented software. Please know that any attempt by you or DIT to sell or otherwise disseminate the source code, as well as any third party's use of that source code, is subject to legal challenge.

Furthermore, neither DIT nor any third party has a right to use the CrossVerify mark, which belongs to Mr. Andrade.

Lastly, we note that in several of your communications with Mr. Andrade over the last several weeks, you intimate at impropriety on his part. Mr. Andrade denies any such allegation.

Going forward, please direct all future correspondence to Mr. Andrade through his counsel at DLA Piper.



Richard Naimer
March 4, 2019
Page Two


Best regards,

Christina E. Ponig


cc:      Nigel Quantick (nigel████████████)
         Mikail Conybeare (mikailconybeare████████████)
         Simon Clark (simon@█████████████)